## GREAT NORTHERN RY. CO. v. WILLARD.

(Circuit Court of Appeals, Ninth Circuit. January 8, 1917.)

### No. 2753.

NEGLIGENCE ☞134(3) — DANGEROUS PREMISES — INJURY TO TRESPASSING CHILD.

Evidence, in an action for injury to a young boy by the falling of some of the ties in a pile on a railroad right of way, near a highway, while he and another boy were climbing up and down the pile, *held* insufficient to fix any liability on the railroad company, though it was charged with knowledge that the boys of the neighborhood were accustomed to play on them, and that they were attractive for that purpose; such knowledge carrying with it the further knowledge that for weeks and months older boys had climbed and played on the pile without causing any of the ties to fall or inflict injury on any one, the ties being peeled, hewn on both sides, and' piled eight high in rows, as close together as possible, there being no evidence that it was necessary or customary to brace ties so piled, and the piles, made by the seller of- the ties, being at the appropriate place for their use by the company.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 267; Dec. Dig. ☞134(3).]

In Error to the District Court of the United States for the Northern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Action by Leslie Willard, a minor, by Joseph J. Lavin his guardian ad litem, against the Great Northern Railway Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded for new trial.

The minor in whose behalf this action for damages was brought against the plaintiff in error as defendant in the court below was 9 years of age when he received the injury complained of by the falling on him of some ties from a pile of ties alleged in the complaint to have been stacked on the right of way .of the plaintiff in error railway company, at the town of Springdale, Stevens county, state of Washington, through which town there was one public street or roadway crossing the railroad track, and near which street the pile of ties in question stood, the complaint alleging that the ties weighed upwards of 300 pounds each, and were piled in about 10 rows of eight ties high in each row; that they were not braced, and that for a number of months prior to the day of the happening of the accident "said pile of ties and said structure was enticing, alluring, and attractive to children of tender years, both boys and girls, and said pile of ties was of such character as to be attractive to children, and of such character as to appeal to childish curiosity and instincts, and for a number of months prior to the date hereinafter referred to, a large number of children, attracted thereby, played in, upon, and about the premises of defendant upon and about said structure, and said pile of ties, all of which was known by defendant, or in the exercise of ordinary care should have been known by defendant"; that on or about the 23d day of February, 1914, the minor in question, not knowing or appreciating the condition of the pile, went upon it, when a large number of the ties fell, throwing him to the ground and inflicting the injuries for which the suit was brought. The defendant company did not deny that the boy was injured by the falling of the ties, but put in issue the other material allegations of the complaint, and here insists upon its contention made in the court below that the case made by the evidence did not justify its submission to the jury, and that the court should have granted its motion made upon the conclusion of all of the

evidence for a directed verdict in its favor; and that is the main question here presented for determination.

Charles S. Albert and Thomas Balmer, both of Spokane, Wash., for plaintiff in error.

Plummer & Lavin, of Spokane, Wash., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). The evidence in the case is without any substantial conflict upon any material point. It shows that the ties in question were cut from the farm of one C. W. Magers, and by him sold to the plaintiff in error, he agreeing to haul and pile them at Springdale, which he did with the assistance of his two sons. Magers, who was a witness on behalf of the plaintiff, testified, among other things, that:

"Nobody on behalf of the company directed the manner or where these ties should be piled; nothing more than their bill in the depot; they specified the way they should be piled and the shape of the ties also."

The record shows that when the defendant company offered in evidence the directions posted in the depot (designated in the record as Defendant's Exhibit No. 7), specifying how the ties should be piled, the plaintiff objected to its introduction, which objection was sustained by the court, and which ruling is here assigned as error. That exhibit was a notice reading, in part, as follows:

## "TIES

"Will be purchased by this company at its option until further notice as per description, price and specifications given hereon, at all stations on the Spokane and Marcus Divisions of the Great Northern Railway in United States between Troy, Mont., and Dean, Wash., including all main and branch lines in limits described. [Specifications regarding character, sizes, and prices of ties omitted as immaterial.] Note—Following instructions must be followed in piling ties on right of way:

"Permission must be obtained at all stations at which there are agents to pile ties on the company's right of way, and agent will designate place where they are to be piled. Ties must be piled at all stations or sidings between switches on skids at or above grade, convenient for loading.

"They must be piled eight ties or more high with a space of three feet between ranks with the small end of each tie facing the track.

"The first rank to be not less than eight feet from the nearest rail, and no ties shall be to exceed 50 feet from the track. All ties must be piled on the ends so inspector can see whether they are all of an even length.

"No peeling of ties will be allowed on company's right of way.

"These instructions must be strictly followed or you will be required to furnish necessary help to rehandle the ties for their protection, economical handling when loading, or for inspection.

"Cards to show ownership of ties and address of owner will be furnished by the purchasing agent, inspector, or station agent. They must be filled out in ink, as provided for, and attached to each pile.

"Any person or persons violating these terms will be considered trespassers, and will assume all risk and be held liable for all damage caused by their action. All ties put out in accordance with this circular and received by the company will be inspected monthly when practicable, commencing with September, 1913, and payments made within thirty days after the month in which inspection is made."

We think the railway company was entitled to introduce the exhibit in evidence for the purpose of showing that by the terms of the sale the ties in question were not stacked by the company but by the seller, Magers, and to have that fact considered by the jury in connection with the balance of the evidence, in the event the case should be submitted to them. But without at all considering the contents of the exhibit (which, as has been said, was not admitted in evidence) we are of the opinion that the evidence was insufficient to fix any liability upon the defendant company, and therefore that no case was made for the consideration of the jury. It shows that the ties were hauled as cut, that they were hewn on both sides and peeled, and that the cutting and hauling extended from about the 1st of January to the 20th of February, and, in consequence of the season of the year, had more or less snow and ice on them. The ties, which varied in width from 6 to 12 or 14 inches, were piled 8 high and in rows as they came, as close together as possible, but necessarily resulting in there being several inches of space between many of them, owing to the difference in width of the respective ties. There were, according to the evidence, about 80 of them in all, the first hauled being laid in the place of other ties just removed and the balance on skids first laid upon the snow, which was, at the time, about 12 inches deep.

In addition to the street or roadway that has been mentioned, there was a path leading past the pile of ties, along which people passed in going from one side of the railway to the other. There was testimony on the part of the plaintiff that for many weeks it had been the custom of the boys in the town of Springdale to play upon the pile of ties in question, a number of them being much older, and presumably heavier, than the plaintiff, and that until the accident to the latter none of the ties had ever fallen. For example, a brother of the plaintiff, Claire Willard, stated:·

That he was 17 years old (when testifying, the plaintiff then being 11), and had lived in Springdale about 10 years. "I have played on this pile of ties referred to in the testimony," said the witness. "Every once in a while I would be on them. One day I would be on, and then I wouldn't be on for quite awhile. It would be along in the evening. It would not be very long. Sometimes in the afternoon. I have been on the tie pile with them, but I have not noticed how many boys was on there, three or four. I have not noticed any more than that on them at any one time. I was there once in awhile while the ties were piled there. They was piled one on top of the other. Some was close together and others farther. They were apart all the way from that far down, for instance (illustrating) about 8 inches. * * * I paid no particular attention to this particular pile before this, and don't remember particularly with reference to it at all. I played on there once a day, and then for a long time would not play there. When I played up and down on these ties none of them fell with me, and I never knew of them having fallen on anybody."

The witness Clifford Ragsdale, called on behalf of the plaintiff, who also testified that he lived in Springdale, and was 15 years old, said:

"I played on this pile of ties two or three times a day for an hour for about two months. Sometimes two or three or two to four boys would play there with me. This was before Leslie got hurt. These ties were piled on top of each other. Some were close together, and some had holes in them. These holes would be about 6 inches. * * * I played on these ties before. I

played with Leslie on them before he got hurt, once. I was not around the day Jimmy Stevens was with him (James Stevens being the boy who was with Leslie when he was injured). I would get on top of the ties, crawl up on them, and sit down. I never had any difficulty with them. They never fell down with me. I never paid any particular attention to this particular pile of ties that was there."

The witness Ervin La France, also called as a witness on behalf of the plaintiff, testified that he also lived in Springdale and was 15 years of age. He said:

"I know the pile of ties that has been described. I played there prior to the time Leslie was injured about half an hour for about a month. Two or three boys would be playing there. Wood tag. * * * I didn't play with Leslie. I played with other boys. Some of the piles looked all right to me. I don't remember anything particular about this particular pile, or the way it was piled, or anything of that sort. None of these ties ever fell with me playing there."

The witness Frank Veenhuis, also called on behalf of the plaintiff, testified that he was 13 years of age and lived at Springdale. He said:

"In going to and from school I pass by the pile of ties described, about six times a day, about 5 feet from them on the roadway. I noticed five or six boys playing on the ties before Leslie was hurt. Playing hide and go seek and cross tag. Had continued for two or three months. That occurred almost daily, at night most of the time before the train came in, after school. On Saturdays sometimes, too. I never paid any particular attention to this pile. I don't know how they were piled. * * * I remember playing on this particular pile. I have seen a lot of the boys playing on that pile. This was a couple of weeks we were playing on the pile. We didn't play all of the time on these ties. When we did play on them, the ties did not fall. We did not play on them, we played around them. The other boys got on, but I didn't. The ties did not fall with them."

The witness J. P. Brown, also called on behalf of the plaintiff, testified, among other things, as follows:

"I helped the Magers unload two loads of ties. Whether them was the ties that fell or not, I could not say. We unloaded them right near the street, on the south side of the depot, between the depot and the livery barn on the south side of the railroad track and on the east side of the street. On the east side of the roadway. I should judge about 75 feet from the livery barn, and about the same distance from the railroad track. We placed the ties we unloaded close to the street, right near the street. I think this was in January, 1914. I had nothing to do with the ties, only to help Mr. Magers. They were not my property. He said they were too heavy for him to handle alone, and he asked me to go and help him. I handled these ties. Some of them were pretty heavy. They was tamarack, and there was snow and ice on them, which made them pretty heavy to handle. I should judge they would weigh 300 pounds each. Mr. Magers directed the place where they should be piled. I don't know whether any of the agents of the company were around there. Mr. Magers just drove up there and unloaded the ties where he stopped, and threw some little poles down, probably 3 inches through and we unloaded the ties, and I had nothing more to do. They were piled on top of the snow. I should judge there was a foot of snow under the ties, if not more. There was snow or ice when the ties were piled there. Some of them when they were piled were together, or almost together, and others would lay 3 inches apart. I didn't place any support or brace against them, or anybody else that I seen. I passed there a number of times and noticed the ties, and never noticed them being braced in any way. * * * We put down skids. I guess there was all of a foot of snow on the ground. We un-

loaded the ties on the skids. The skids was put down on top of the snow, and the ties laid on the skids. Some of the ties would not go over 150. and others would weigh 300."

There was other testimony of the same character; the foregoing is the substance of it.

It was further shown by the evidence that at the time of the accident the plaintiff and the boy James Stevens were climbing up and down the pile of ties in question, when some of them fell, inflicting the injury for which the action was brought—whether the ties slipped and fell by reason of the melting of the ice and snow, or from having been, to some extent, displaced by the previous climbing on them of the older boys, or from defective stacking, does not appear, and from the nature of things most likely can never be known. The fact remains, however, that the pile of ties in question appears to have withstood the previous climbing of older and presumably heavier boys from time to time, for weeks and months; that they were essential to the upkeep of the railroad, and were stacked by the seller of them on the company's right of way at the appropriate place for their use, and, conceding that the agents of the appellant company may be properly held to have known that the boys of the neighborhood were accustomed to play upon them, and that they were attractive for that purpose, the knowledge so imputed carries with it the further knowledge on the part of such agents that for weeks and months the older boys had climbed and played upon the pile without causing any of the ties to fall or to inflict any injury upon any one. The law enjoins upon railroad companies the duty of maintaining their roads in a safe condition, which manifestly cannot be done without replacing worn-out and defective ties with new ones, a supply of which must necessarily be provided and kept piled by the companies at convenient places on their rights of way. There was nothing in the evidence tending to show that it was at all necessary to brace ties so piled, or that it had ever been customary to do so.

We are of the opinion that the case made for the plaintiff by the evidence failed to show any liability on the part of the appellant for the injuries received by the plaintiff, that there was no fact or circumstance shown by it from which the jury would have been authorized to draw any inference or conclusion of negligence on the part of the railway company, and therefore that the latter was entitled to a directed verdict in its favor.

We think the cases of Railroad Company v. Stout, 17 Wall. 657, 21 L. Ed. 745, known as the Turntable Case, and Cœur d'Alene Lumber Company v. Thompson, 215 Fed. 8, 131 C. C. A. 316, L. R. A. 1915A, 731, decided by this court, unlike the present one and inapplicable to it. In the former case the catch which locked the turntable when not in use by the railroad company had been broken, and had not been repaired, although the agents of the company knew that boys were accustomed to go and play upon the turntable, a part of which amusement would naturally be the turning of the turntable while they were on or about it, and it was, moreover, in that case proved to have been usual with railroad companies to have upon their

turntables a latch or bolt or some similar instrument. The Supreme Court there said, among other things:

"It was to be expected that the amusement of the boys would have been found in turning this table while they were on it or about it.' This could certainly have been prevented by locking the turntable when not in use by the company. It was not shown that this would cause any considerable expense or inconvenience to the defendant. It could probably have been prevented by the repair of the broken latch. This was a heavy catch which, by dropping into a socket, prevented the revolution of the table. There had been one on this table weighing some 8 or 10 pounds, but it had been broken off and had not been replaced. It was proved to have been usual with railroad companies to have upon their turntables a latch or bolt, or some similar instrument. The jury may well have believed that if the defendant had incurred the trifling expense of replacing this latch, and had taken the slight trouble of putting it in its place, these very small boys would not have taken the pains to lift it out, and thus the whole difficulty have been avoided. Thus reasoning, the jury would have reached the conclusion that the defendant had omitted the care and attention it ought to have given, that it was negligent, and that its negligence caused the injury to the plaintiff. The evidence is not strong, and the negligence is slight, but we are not able to say that there is not evidence sufficient to justify the verdict. We are not called upon to weigh, to measure, to balance the evidence, or to ascertain how we should have decided if acting as jurors."

The death of the child involved in Cœur d'Alene Lumber Co. v. Thompson, resulted from drowning in a shallow well, the allegation of the complaint in that regard being:

"That for some time prior to the 1st day of June, 1911, the defendant had owned, operated, and maintained a sawmilling and woodworking plant, located upon its lands in the city of St. Maries, in the state of Idaho; that as part of the plant the defendant had caused to be excavated a certain cistern or well, which was used by it for the storage of water in connection with its milling plant; that some months prior to the 1st day of June, 1911, the defendant caused all of its buildings, machinery, and appliances to be moved from its lands in the city of St. Maries, but carelessly and negligently failed to fill up or cover the cistern or well excavated by it, and carelessly and negligently permitted the cistern or well to remain open up to and including the 1st day of June, 1911; that on that date the cistern or well had become filled with water to a depth of about 10 feet, and had become extremely dangerous to children of tender years and to others who had occasion to go upon the premises, either for business or for pleasure, and the lands, maintained as aforesaid by the defendant, had become and were dangerous premises; that for many months prior to the 1st day of June, 1911, the minor son of the plaintiff, Bernarr Thompson, with numerous other children living in the city of St. Maries, had frequently and habitually gone upon, over, and across the lands and premises of the defendant in the vicinity of the cistern or well for the purpose of play and amusement, all of which was known by the defendant, or could have been known by it in the exercise of reasonable care, and ought to have been, and was, anticipated by it and its agents and servants; that the dangerous condition of the premises of the defendant, and the danger of small children falling into its cistern or well and becoming drowned, and the habitual use of the premises by Bernarr Thompson and other companions and children of tender years was open and notorious up to the time of the death of said Bernarr Thompson, and was well known to the defendant; that on account of the tender years of Bernarr Thompson he did not know or appreciate the dangerous condition of the premises of the defendant; that on the 1st day of June, 1911, Bernarr Thompson, in company with other children, were playing in, about, and upon the premises of the defendant, and close to and in the immediate vicinity of the cistern or well excavated by it, which at that time was filled with water up to and on a level with the ground; that said Bernarr Thompson, while so playing therein and thereabout, accidental-

ly and inadvertently fell into the cistern or well and was drowned; that the negligence and carelessness on the part of the defendant in failing and neglecting to fill up or cover the cistern or well which had been excavated by it was the proximate and sole cause of the death of Bernarr Thompson."

In addition to a denial of the allegations of the complaint, the defendant to that action set up as matter of affirmative defense that it had been, at all of the times mentioned in the complaint, the owner of a certain described piece of land, and—

"that on the 14th day of September, 1907, the defendant entered into a written contract with a certain copartnership doing business under the firm name of Schmidt Bros., to manufacture into timber and lumber for the defendant all of the logs then being on the lands above described and owned by the defendant; that thereupon Schmidt Bros. erected a sawmill on the lands of the defendant, and engaged in manufacturing lumber for the defendant, pursuant to the terms of the contract, up to and including the month of October, 1908; that in the operation of the sawmill by Schmidt Bros., and without the knowledge of the defendant, sawdust accumulated in piles adjacent to the sawmill; that back of the sawmill there was a small ravine, which sloped from a hillside toward the mill site of Schmidt Bros.; that water flowed through the ravine and terminated at the piles of sawdust into a small pool or sink, forming a pond about 25 or 30 feet long and about 12 or 15 feet wide; that the pool or pond was off and out of the way of any public highway; that at all times mentioned in the answer the pool or pond remained open, uninclosed, and uncovered, and that it was caused by Schmidt Bros. leaving upon their mill site piles of sawdust, against which the waters in the ravine flowed, stood, and remained; that, if any well was dug by Schmidt Bros. upon the premises, the defendant had no knowledge thereof. The defendant further alleged in its answer that the plaintiff knew of the existence of the pool or pond of water, and knew that his minor son was in the habit of going upon the premises, and that the carelessness and negligence of the plaintiff in failing to exercise due care, control, and supervision over his minor son, and in omitting to restrain and prevent him from entering upon the premises of the defendant, were the proximate causes of the death of his son."

We held the allegations of the complaint sufficient to constitute a cause of action, and in respect to the affirmative defense set up as follows:

"It appears from the testimony that on the 14th day of September, 1907, the defendant entered into a written agreement with a copartnership doing business under the firm name of Schmidt Bros., wherein and whereby the latter agreed to saw and manufacture into timber and merchantable lumber logs to be furnished to them by the defendant herein, and to be cut from fractional section 27, township 46 north, range 2 W. of Boise meridian, for a stipulated price particularly set forth in the agreement. Schmidt Bros. were to begin the work of manufacturing the timber for the defendant by the 15th day of October, 1907, if it was possible for them to have their mill set up by that time. It was further agreed between the parties that the timber was to be sawed at all times under the direction of the defendant herein, its agent or manager. It further appeared from the testimony that pursuant to this agreement the mill was built by Schmidt Bros., and operations thereon were begun about November 1, 1907; that Schmidt Bros., continued to operate the mill in the performance of their contract with the defendant for about a year, completing their contract at that time, although the mill was not removed from the premises of the defendant until the year 1910. It further appeared from the testimony that, for the purpose of obtaining water for the operation of their mill, Schmidt Bros. dug a well at a point on the defendant's land near the mill, where there was a small spring in a ravine or gulch. The well was about 5 feet deep, and about 4 feet wide and 6 feet long. It was dug in such manner that the spring was right in the bottom thereof, and constituted

the source of supply of water for the well. The sides of the well were curbed with 2-inch planking, which extended up to, but not above, the surface of the ground. When the mill was not being operated and water not being drawn from the well, it filled up and overflowed through a drain extending down the ravine or gulch. In the operation of the mill sawdust was deposited in piles in the vicinity of the well, and at the time of the death of the minor son of the plaintiff the drain or outlet had become clogged with sawdust, causing the waters of the well to back up and accumulate above the top of the well proper, forming a pond or pool about 8 or 10 feet wide and about 18 or 20 feet long. The pool or pond thus formed consisted of a rim of shallow water 6 or 8 inches deep, terminating abruptly in the well which it surrounded. The testimony also tended to show that by reason of the muddy condition of the water, and the sawdust surrounding the pool and floating thereon, the well at the bottom thereof was not visible."

It will be seen that the facts of each of the cases from which the foregoing quotations have been taken were essentially different from the facts appearing in the case now before us, and we are of the opinion that the doctrine applied in those cases is inapplicable here, and should not be so extended as to embrace the facts of this case.

The judgment is reversed, and the cause remanded to the court below for a new trial.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes